UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 20-CR-181(1)(PJS)

UNITED STATES OF AMERICA,

        Plaintiff,

v.

DYLAN SHAKESPEARE ROBINSON,

        Defendant.

**GOVERNMENT'S SENTENCING MEMORANDUM**

For the following reasons, the United States recommends that Defendant Dylan Shakespeare Robinson receive a sentence 48 months imprisonment. The United States believes that such a sentence is sufficient, but not greater than necessary, to comport with the Section 3553(a)(2) sentencing factors.

## I. Relevant Facts

### A. Offense Conduct

On May 25, 2020, George Floyd died while being arrested by the Minneapolis Police Department. (Presentence Investigation Report ("PSR") ¶ 11, ECF No. 125.) The nature and circumstances of Mr. Floyd's arrest, subsequent death, and the actions of the Minneapolis Police Department came under intense public scrutiny. (*Id.*) Almost immediately following Mr. Floyd's death, public protests began in Minneapolis and expanded throughout the Twin Cities metro area. (*Id.*)

Following the mostly peaceful protests that occurred on May 26, 2020, the cities of Minneapolis and St. Paul endured multiple nights of violence and destruction. (*Id.* ¶ 12.) Between May 27 and May 30, 2020, following several peaceful

protests, hundreds of individuals vandalized and looted local businesses and destroyed buildings, vehicles, and other property through arson, smashing doors and windows, and throwing objects. (*Id.*) The Minneapolis neighborhood surrounding the East Lake Street-Hiawatha intersection, near the site of the police's encounter with Mr. Floyd, was particularly hard hit, with numerous business in the neighborhood looted and partially destroyed by vandalism and arson (*Id.*) On May 27, 2020, several businesses surrounding the Third Precinct were looted, and multiple fires were set, including to an apartment complex under construction that was essentially destroyed. (*Id.*) City authorities began to discuss if the Third Precinct building should be abandoned, and vehicles, weapons, computers, and sensitive files were ultimately moved offsite. (*Id.*)

On May 28, 2020, it became clear that assistance was required. The National Guard was called on to assist in the city of Minneapolis. (*Id.* ¶ 13.) Throughout the day, hundreds of people remained gathered around the Third Precinct building. (*Id.*) A small handful of officers were stationed on the roof guarded the building. (*Id.*) A mobile fence had been erected around the building which was increasingly tested by the protestors as the evening went on. (*Id.*) At about 9:30 p.m., the approximately 15 to 20 officers that remained at the Third Precinct were ordered to evacuate as the crowd, which by some estimates topped 1,000 people, grew larger and more aggressive, and became increasingly uncontrollable. (*Id.*)

Shortly after 10 p.m., an individual breached the temporary fence that had been protecting the Third Precinct building. (*Id.* ¶ 14) Soon after, many protestors

followed and entered the building. (*Id.*) Rioters damaged property and set multiple fires in the building. (*Id.*) Firefighters could not reach the building due to the large number of protestors and the violent acts of the rioters. (*Id.*) The fires were eventually extinguished the following morning. (*Id.*)

Dylan Robinson was captured of surveillance video lighting an object on fire, held by another unidentified co-conspirator, before that individual threw the object towards the Third Precinct (where multiple fires had already been set). (*Id.* ¶ 20.) Robinson can be seen, wearing a white sweatshirt with a distinctive black horizontal stripe and a black stocking cap, lighting the object on fire. Robinson then looks on as the individual throws the lit object at the Third Precinct.

 



Another video shows Robinson throwing a flaming object towards the Third Precinct.



Robinson also set fire to a pile of flammable materials (which appeared to be cardboard boxes) in a stairwell inside the Third Precinct. (*Id.*) The video, uploaded by another individual to a public Facebook account, shows an unidentified co-conspirator spray a flammable liquid onto the fire after Robinson lit it.



### B. Community Impact

Robinson and his co-conspirators' conduct impacted the surrounding community, both those associated with the Third Precinct as well as community business owners and residents more broadly.

Multiple officers stationed at the Third Precinct submitted victim impact statements. They described the impact of seeing their workplace destroyed. Family members of law enforcement officers also submitted statements, like the young child that discussed the feeling of seeing her mother's place of work burn live on television while worrying about the safety of her mother. Civilian employees who worked at the Third Precinct also submitted statements. One individual, a Crime Prevention Specialist, addressed community members' concerns for high crime areas located in the precinct. He discussed the damage to the community by the loss of community programs like the Community Response Team and Neighborhood Coordination Officers, and how those in the community rely on those resources. Numerous community members also submitted statements describing the impact of the destruction of the Third Precinct. One described the impact to the community of the lack of police resources due to the Third Precinct being destroyed, including that the police are hampered in their ability to respond to crime due to the absence of the precinct building. Others discussed the defeat, despair, and fear they felt as community members witnessing firsthand the destruction to their local police precinct.

In the plea agreement, the parties agreed that the Mandatory Victims Restitution Act applies and that the total amount of restitution for the loss suffered by the Minneapolis Police Department was $12,000,000. (PSR ¶ 23.) Those costs include rebuilding or repairing the Third Precinct building, as well as additional costs for equipment, clean up, and overtime pay for city employees in the aftermath of the arson. (*Id.* ¶ 25.)

### C.     History of the Defendant

#### 1.     **Personal Background**

Robinson is 23 years old. (PSR ¶ 61.) Robinson had a tumultuous and unstable childhood. Robinson's father was not present when he was growing up. (*Id.*) He was raised primarily by his single mother in Brainerd, Minnesota. (*Id.*) When Robinson was young, his mother was in an abusive relationship. (*Id.*)

When Robinson was approximately 10 years old, his mother began a relationship with a different man who lived in north Minneapolis. (*Id.* ¶ 62.) Robinson and his mother relocated to Minneapolis for about a year. (*Id.*) Although a significant change from Brainerd, Robinson enjoyed his time in Minneapolis meeting new, diverse people and learning how to skateboard, which is a hobby and passion of his. (*Id.*) When that relationship ended, Robinson and his mother moved back to Brainerd. (*Id.*)

Robinson reported feeling "isolated and lonely" during his early teenage years. (*Id.* ¶ 63.) He focused on his main hobby, skateboarding. He also started using drugs at age 13. (*Id.*) At age 14, he began staying with a girlfriend, and by age 16, he has essentially moved out of his mother's apartment. (*Id.*) He would often stay with

6

friends or travel around the country on road trips to participate in different skateboarding events. (*Id.*)

Robinson has begun a relationship with his biological father. (*Id.* ¶ 64.) His father reached out to him on social media, and they now have a sporadic relationship. (*Id.*) His father is "homeless by choice" and lives out of a vehicle in Minneapolis. (*Id.*) According to Robinson, his father told him that his mother was emotionally abusive, while his mother told him that his father was physically abusive. (*Id.*)

Robinson attended public school through the sixth grade. (*Id.* ¶ 84.) After that, he was often truant or at times homeschooled. (*Id.*) He tried several alternative schools in high school, but stopped attending when he reached age 16. (*Id.*)

### 2. Mental Health and History of Substance Abuse

Robinson has a history of struggling with substance abuse. He first tried marijuana at age 13, and he quickly became a daily user. (*Id.* ¶ 75.) By age 14 or 15, he was drinking heavily and experimenting with heroin, opiates, and other drugs. (*Id.*) By age 16, his drugs of choice became LSD and psilocybin mushrooms, and primarily used those several times a month, along with marijuana daily. (*Id.*)

Robinson was arrested for drug possession at age 18. As part of his ten year probationary sentence, he began regular drug testing. (*Id.* ¶ 77.) He struggled with drug use during this period, testing positive for marijuana multiple times. (*Id.*) After moving to Minneapolis in 2019, Robinson increased his alcohol consumption and also began using cocaine recreationally. (*Id.* ¶ 78.)

Robinson has participated in several substance abuse treatment programs, although with varied success. (*Id.* ¶ 79.) He has struggled to complete these programs

and on more than one occasion withdrew. Most recently, Robinson has been residing in a sober housing facility in St. Paul and was admitted for continued outpatient treatment. (*Id.* ¶ 83.) To his credit, he has attended at least 20 hours of programming each week in January and February of 2021, and all drug tests submitted since his initial appearance in this case have been negative. (*Id.*)

Robinson also has a history of mental and emotional health challenges. Robinson believes that some of these struggles are related to experiencing and witnessing abuse in his mother's relationships as a child. (*Id.* ¶ 71.) When evaluated in November 2020, he met the criteria for posttraumatic stress disorder and major depressive disorder. (*Id.* ¶ 72.) Records reflect a history of self-harm and a suicide attempt at age 15. (*Id.* ¶ 74.)

    3.    **Criminal History**

Robinson has one previous felony conviction, along with multiple lower level misdemeanor convictions. In 2015, Robinson pled guilty to driving without a license and with no proof of insurance, along with possession of marijuana and drug paraphernalia. (PSR ¶ 52.) He paid a fine to resolve his case. In 2016, Robinson pled guilty to fourth degree drug possession. (*Id.* ¶ 53.) Robinson was in possession of half a gram of marijuana and 13 squares of blotter paper of LSD. (*Id.*) He received a stay of adjudication and 10 years probation. He also has two misdemeanor driving infractions in 2019 for driving an uninsured vehicle and driving with expired registration. (*Id.* ¶¶ 54-55.) Robinson has multiple juvenile offenses, including for curfew violations, skateboarding in a prohibited area, and a fireworks violation. (*Id.* ¶¶ 45-50.)

## II. Argument

### A. Legal Background

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007). "[U]nder the advisory guidelines scheme, sentencing judges are required to find sentence-enhancing facts only by a preponderance of the evidence." *United States v. Scott*, 448 F.3d 1040, 1043 (8th Cir. 2006).

"[A]fter giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." *Gall*, 552 U.S. at 49-50; 18 U.S.C. § 3553(a). The Section 3553(a) factors include "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the need for the sentence to reflect the seriousness of the offense," "the need for deterrence," "the need to protect the public from further crimes of the defendant," and "the need to avoid unwarranted disparities." 18 U.S.C. § 3553(a).

### B. The Presentence Investigation and Guidelines Calculations

The United States has reviewed the PSR prepared by the U.S. Probation Office. As noted in the PSR, on September 25, 2020, Robinson pled guilty pursuant to a plea agreement to a single count Indictment charging him and three co-defendants with Conspiracy to Commit Arson. (PSR ¶ 2.) In his plea agreement with the government, Robinson agreed that the base offense level was 24 and no adjustments or enhancements.

Although the total offense level contemplated in the plea agreement is consistent with the PSR, the parties contemplated that Robinson would fall into a criminal history category II (although that was not a stipulation, merely a belief based on an assessment of the information currently known to the parties).

The PSR concluded that Robinson is criminal history category III, with four total criminal history points – one point for his drug possession case, two points for committing the instant offense while under a criminal justice sentence, and one point for a petty misdemeanor citation for possession of marijuana and drug paraphernalia. Although it differs from the plea agreement, the Government concurs with the technical computation of criminal history calculation in the PSR. (*Id.* at ¶ 116.)

However, the PSR also notes that a downward departure to criminal history category II may better reflect the seriousness of Robinson's criminal history and risk of recidivism. (*Id.*) The PSR concluded that the resulting criminal history category of III was not commensurate with Robinson's history considering, among other reasons, he has otherwise never served any jail terms. (*Id.*) The Government similarly concurs that criminal history category II more accurately reflects the seriousness of Robinson's criminal history and the likelihood that he will commit other crimes.

The PSR concluded that, based on a total offense level of 21 (including a 3-level reduction for acceptance of responsibility) and criminal history category of III, the resulting advisory Guidelines range of imprisonment is 46 to 57 months imprisonment. If the Court determines that Robinson's criminal history is overstated and instead falls into criminal history category II, the Guidelines range is 41 to 51

months imprisonment. (*Id.* ¶ 6.)

Robinson also stipulated in the Plea Agreement that the loss amount for purposes of restitution was $12,000,000, but the parties reserved their rights to make legal arguments about the amount of restitution to be paid by Robinson.

### C.   The Appropriate Sentence

A careful consideration of the Section 3553(a) factors warrants a sentence of 48 months imprisonment. This sentence is on the high end of the Guidelines range if the Court were to determine that Robinson should be criminal history category II.

### 1.   The Nature and Circumstances of the Offense and the Need for the Sentence Imposed to Reflect the Seriousness of the Offense

Robinson participated in an unquestionably serious conspiracy to commit arson at a police station, which requires a correspondingly significant sentence. Robinson lit objects on fire, threw burning objects at the building, and set a fire inside the Third Precinct.

However, Robinson was one of only many who participated in the near total destruction of an active police station. Investigating agents identified at least 45 areas of origin where fires had been started throughout the Third Precinct building. Dozens of unidentified co-conspirators participated in setting those fires, along with looting, vandalism, and destruction of the rest of the building. From a destruction standpoint, Robinson's conduct played an average (or possibly slightly above average) role compared to others.

On the other hand, Robinson was among the first individuals to approach the Third Precinct building when the protests began to turn violent. Some additional

11

culpability is warranted for his early conduct, which likely spurred other protestors to enter the building and propagated additional arson and destruction.

In his written statement of acceptance of responsibility, Robinson discussed his regret for his actions involving the Third Precinct and how he knows what he did that night was wrong and criminal. (PSR ¶ 27.) He also expressed remorse that his actions hurt his original goal when he decided to join the protests, which was to promote justice and end police brutality. (*Id.*) The Government takes Robinson at his word that he is indeed remorseful for his conduct and does not believe that he came to the protest to commit violent crimes or wreak havoc.

The protests of racial injustice following the death of George Floyd and events leading up to the arsons at the Third Precinct were unprecedented. Importantly, much of the anger and pain of protesters was directly aimed at the Third Precinct – as a building and as a symbol – because all four officers associated with the death of George Floyd were stationed at the Third Precinct. That fact in no way excuses the violence or destruction aimed at the Third Precinct. It does, however, create a juxtaposition against the violence and destruction of seemingly unrelated buildings in the community, including a school, liquor stores, pawn shops, and a post office (to name but a few examples of local businesses that were looted, vandalized, set on fire, or otherwise destroyed).

Ultimately, however, the sentence imposed must reflect the unquestionably serious nature of the offense. Robinson threw a lit item at the building. He also lit a fire inside the building. He participated in the near total destruction of an active

police precinct that caused $12 million in damages. The neighborhoods served by the Third Precinct faced unique challenges of dealing with an increase in crime rates without a precinct to house the police force charged with protecting those neighborhoods.

In addition, the sentence should reflect the seriousness of arson, a violent felony. Robinson set a fire inside the building, at the base of a stairwell. Numerous other people were in the vicinity and an unknown number of people were upstairs. Robinson's conduct placed these people in significant danger. He risked the lives of numerous individuals inside the Third Precinct. Once a fire is started, it can spread uncontrollably and cause untold damage to people or property. This is precisely why arson is considered a violent crime. A significant sentence will reflect the serious risks to and impact on the community from the arsons committed at the Third Precinct.

2. **The History and Characteristics of the Defendant**

Robinson's culpability is to some extent diminished by the challenges and difficulties he faced in his upbringing, as well as his challenges with his mental and emotional health. Much of Robinson's upbringing appears to have been spent without strong parental oversight or other mentorship. He struggled in school and did not receive much of a high school education. He also appears to have struggled with undiagnosed and untreated mental health challenges as a child, including self-harm and a suicide attempt at age 15. From an early age, as young as 14, he was sporadically living with friends or partners and away from his family. Likely due to many of these reasons, Robinson turned to drugs and alcohol. His challenges with

substance abuse only amplified the other problems he faced in his life. None of this serves as an excuse or justification for his participation in the arsons committed at the Third Precinct. But it may offer some explanation for how he ended up in this situation.

After being charged by complaint, Robinson promptly accepted responsibility for his wrongdoing. He met with the Government. He entered a guilty plea early and admitted his culpability.

3. **The Need for the Sentence Imposed to Promote Respect for the Law and Afford Adequate Deterrence.**

It is almost unfathomable to think that an active police precinct in the city of Minneapolis was overrun, looted, vandalized, and set on fire. This conduct represents a total breakdown of respect for the law. A significant sentence is necessary to promote respect for the law.

The sentence should have an overall deterrence effect. The sentence imposed must be tailored to prevent Robinson from committing another crime. This is not Robinson's first felony conviction, although it does mark a significant departure from his previous convictions for drug possession. None of his previous convictions involved violence or arson. Robinson has never served a term of incarceration for any of his previous convictions. The Government does not believe that a significant sentence in necessary to provide specific deterrence to prevent Robinson from committing another similar crime.

However, general deterrence is also necessary to demonstrate the importance of laws and deter future conduct. *See Ferguson v. United States*, 623 F.3d 627, 632

(8th Cir. 2010) ("Congress specifically made general deterrence an appropriate consideration . . . and [the Eighth Circuit has] described it as 'one of the key purposes of sentencing.'") Others are more likely to be deterred from committing similar violence and destruction if they learn they will pay a stiff price for it.

A sentence of 48 months imprisonment will serve the needs of sentencing to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, and afford adequate deterrence.

### 4. **The Need to Avoid Unwarranted Sentencing Disparities**

Three co-defendants have plead guilty and are presently awaiting sentencing before this Court. The Government previously submitted its sentencing position memorandum as to co-defendant Bryce Williams, which recommended to this Court that Williams receive a sentence of 42 months imprisonment. Williams has not yet been sentenced. The Government is not aware of any other cases that would create an unwarranted sentencing disparity.

## III. Conclusion

For all the above reasons, the United States respectfully requests that the Court impose a sentence of 48 months imprisonment.

Respectfully submitted,

Dated: March 26, 2021

W. ANDERS FOLK
Acting United States Attorney

/s/ *Harry M. Jacobs*

BY: DAVID P. STEINKAMP
HARRY M. JACOBS
Assistant U.S. Attorneys