UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

UNITED STATES OF AMERICA,

                 Plaintiff,

                                        Crim. No. 20-CR-00181-PJS-BRT

v.

DYLAN SHAKESPEARE ROBINSON,

                 Defendant.

---

**DEFENDANT'S POSITION WITH
RESPECT TO SENTENCING**

**I.    INTRODUCTION**

On May 25, 2020, George Floyd was arrested in the Powderhorn Park area of Minneapolis for allegedly uttering a false $20 bill at a convenience store. During Floyd's arrest, an officer restrained Floyd for nearly eight minutes by pinning a knee to Floyd's neck, despite protests from Floyd himself, and members of a growing crowd of onlookers. Floyd was motionless and unresponsive during the final two minutes.[1] Floyd was without a pulse from the moment first responders arrived on the scene and was pronounced dead ninety minutes later at Hennepin County Medical Center.[2] The officers involved in Floyd's arrest were assigned to the Minneapolis Police Department's Third Precinct.

---

[1] *See* Associated Press, *Prosecutors Say Officer had Knee on George Floyd's Neck for 7:46 Rather Than 8:46*, L.A. TIMES (June 18, 2020), https://www.latimes.com/world-nation/story/2020-06-18/derek-chauvin-had-knee-george-floyd-neck-746-rather-than-846 (last visited Mar. 26, 2021).

[2] *See* Liz Sawyer, *George Floyd Showed no Signs of Life from Time EMS Arrived, Fire Department Report Says*, MINN. STAR TRIB. (May 28, 2020), https://www.startribune.com/first-responders-worked-nearly-an-hour-to-save-

George Floyd's death inspired protest activity within Minneapolis and in other cities across the country, even internationally. These protests, in turn, provoked an immediate police response.[3] Police in Minneapolis, for example, began employing rubber bullets and tear gas on protestors gathered around the Third Precinct on May 26 and 27.[4] On May 28, in an overreaction to this overreaction, protestors penetrated security fences on the perimeter of the Third Precinct, breached the building's doors, and began setting fires and damaging property inside. A crowd of perhaps a thousand people was involved. *See* Presentence Investigation Report (ECF No. 138) (Hereinafter "PSR") ¶ 13.

Dylan Robinson was part of that multitude. Upset by violent police attacks directed at him and his friends, Robinson entered the grounds of the then-abandoned and burned Third Precinct on May 28. No police officers were inside or outside the building at that time. Robinson assisted another protestor in lighting a roll of toilet paper. The other protestor then threw the burning paper at the Third Precinct causing minimal damage. Robinson made two other small attempts to damage the Third Precinct, then departed.

Robinson has plead guilty to the charged offense. He understands and accepts that his actions on the night of May 28 were criminal, a "stupid" and "harmful" expression of protest. Robinson's actions were, however, a very small part of a response by Robinson's

---

floyd-before-he-was-pronounced-dead/570806682/ (last visited Mar. 26, 2021).

[3] *See* Kim Barker, Mike Baker & Ali Watkins, *In City After City, Police Mishandled Black Lives Matter Protests*, N.Y. TIMES (Mar. 20, 2021), https://www.nytimes.com/2021/03/20/us/protests-policing-george-floyd.html (last visited Mar. 26, 2021).

[4] *See* Mahita Gajanan, *Minneapolis Police Fire Tear Gas, Rubber Bullets at Crowds Protesting George Floyd Killing,* TIME (May 27, 2020), https://time.com/5843070/george-floyd-minneapolis-protest-police-death/ (last visited Mar. 26, 2021).

entire community. Robinson was young, impressionable even for his age, and easily swept up in the historic moment unfolding before him.

For these reasons, Robinson respectfully submits that a sentence of sixty months on probation, the statutory maximum of five years, is sufficient but not greater than necessary to meet the goals of sentencing outlined in 18 U.S.C. § 3553(a).

Furthermore, the Court should order Robinson to pay $12,000 in restitution, an amount commensurate with this minimal conduct as one member of a crowd of a thousand or more. To hold Robinson liable, jointly and severally, for the full twelve million dollars in damage caused by the actions of perhaps a thousand people, actions Robinson did not (indeed could not) direct or predict or control, may violate the Eighth Amendment's excessive fines clause and the spirit of the Mandatory Victim's Restitution Act. *See Paroline v. United States*, 572 U.S. 434, 456 (2014) (noting that holding a defendant "liable for millions of dollars in losses collectively caused by thousands of independent actors might be excessive and disproportionate in these circumstances."). *See also* Defendant Williams' Position Regarding Restitution, (ECF No. 147) (making a similar argument for Defendant Williams).

## II. DYLAN ROBINSON'S PERSONAL HISTORY AND CHARACTERISTICS

### A. Dylan Robinson's Upbringing and Education.

Robinson was born on September 27, 1997. Growing up, Robinson was raised by his mother, but never felt close to her. Robinson was out of contact with his father, Robin Robinson (who now goes by Oliver Om) until late adolescence. PSR ¶ 64. Robinson's

mother was in an abusive relationship with a live-in partner for most of Robinson's childhood, and Robinson has heard from his mother that his biological father was abusive as well. *Id.* ¶ 61 & 64. Robinson received no guidance or affection from his mother's partner. *Id.* ¶ 61.

Thus, Robinson was a loner from a young age. He feels as though he raised himself, and spent considerable time away from his family, often escaping to the calm of the woods, where he felt at peace and at home. *Id.* To this day, Robinson remains largely independent. He has only intermittent contact with his mother. Robinson has supported himself in his adolescence through a variety of food service and landscaping jobs.

By his own admission, Robinson has always had problems with authority figures. *Id.* ¶ 84. Robinson stopped attending public school in sixth grade, and was homeschooled instead, though he acknowledges that his mother did much of his schoolwork for him, including taking all of his tests. Robinson never completed high school. *Id.* He had moved out of his mother's home, and stopped attending school entirely, by the time he was sixteen.

Instead, Robinson found meaning through skateboarding and a network of friends. *Id.* ¶ 63. His closest friends have been those who shared his passion. Robinson has, at various times in his young life, undertaken cross-country road trips to visit distant skate parks. *Id.*

### B. Dylan Robinson's Life at the Time of the Offense.

Robinson brought his skateboard with him to the Third Precinct on the night of May 28, 2020. At this point in his life, Robinson was twenty-three, and living with his girlfriend Gianina Larson in an apartment just a few blocks from where George Floyd was killed. *Id.* ¶ 27. He had, at that time, little formal education, no close family connections, only a few

4

friends, and was unemployed following intermittent work in food service, auto-detailing and as a pizza deliveryman. *Id.* ¶ 89–93. For years prior to the incident, Robinson had struggled with the burden of undiagnosed depression, a feeling that life "always felt hopeless" and that nothing he did mattered. *Id.* ¶ 73.

In late May of 2020, Robinson found hope and meaning in the opposition to police violence that was sweeping through Minneapolis. Robinson learned of George Floyd's death within hours, and later that day, he joined the burgeoning protest movement. In his own words "[t]his was my first protest, and they made me feel like I was making a meaningful difference. It was inspiring to see a group of people gathered together demanding something in one voice." *Id.* ¶ 27.

However, the gathering protest was quickly met with opposition by Minneapolis police. Over the next few days, Robinson and his friends became the target of numerous incidents of police violence. Robinson describes being hit with rubber bullets and batons and being blinded by tear gas and deafened by concussion grenades. *Id.* Robinson's experiences were not at all unusual among protestors in the days following George Floyd's death. When assessed by Restoration Counseling and Community Services a few months after the offense, Robinson met the criteria for post-traumatic stress disorder. He reports being traumatized by the events of late May, 2020. *Id.* ¶ 71. Robinson, along with the young women and men he protested with, was outraged and afraid.

### III. The Offense.

Robinson joined protestors gathered at the Third Precinct before sunset on May 28, 2020. At that point, the protest was mostly a peaceful affair, but as the afternoon wore on

the situation rapidly deteriorated. Around 9:30 PM, Minneapolis Mayor Jacob Frey gave the order to evacuate the Third Precinct.[5]

Sometime just before 10:00 PM, protestors succeeded in shaking down a fence on the periphery of the Third Precinct. After the fence came down, protestors entered the grounds of the Third Precinct at roughly the same time the last officers were leaving. Robinson entered the grounds sometime after the fences fell. *See* Robinson Plea Agreement and Sentencing Stipulations, (ECF No. 108) (hereinafter "Plea") ¶ 2. Multiple fires had already been lit on the interior and exterior of the Third Precinct when Robinson entered the grounds, and the major damage had already been done. *Id.*; PSR ¶ 27.

While standing at the entrance of the Third Precinct, another protestor enlisted Robinson's help in lighting an object on fire. Robinson used his lighter to ignite an object in the protestor's hand. Robinson's recollection is that the object in question was a roll of toilet paper. *Id.* Surveillance video from the incident does show other protestors carrying rolls of paper products near the entrance of the Third Precinct. The factual basis for Robinson's plea states that the item in question was simply "an item." Once the item was lit, Robinson's fellow protestor threw it in the direction of the Third Precinct building. Robinson made two other attempts to damage the Third Precinct before departing.

Robinson's actions that night were a small part of a historic incident. Many details about the incident remain unknown, even a year later, and unbiased coverage and

---

[5] Liz Navratil, Anna Boone, & James Eli Shiffer, *The Siege, Evacuation, and Destruction of a Minneapolis Police Station*, MINN. STAR TRIB. (Aug. 11, 2020), https://www.startribune.com/minneapolis-third-precinct-george-floyd-emails-public-records-reveal-what-happened-before-abandoned-mayor-frey/566290701/ (last visited Mar. 26, 2021).

6

accounting of the incident is difficult to find, given the controversial nature of the protest movement, as well as police response to the protest movement.

There is no controversy, however, in the criminal nature of Robinson's actions. Robinson felt, even at the time, that his actions were stupid and counter-productive to a movement that he found incredibly meaningful. PSR ¶ 27. Robinson also realizes that while his actions were part of a very large group, he was individually responsible for his decisions that evening, including his decision to assist another protestor in throwing a burning object at the Third Precinct after it was abandoned by police earlier that night.

## IV. A DOWNWARD VARIANCE TO 60 MONTHS PROBATION IS REASONABLE AND SUFFICIENT

### A. Robinson's PSR Accurately Calculates the Offense Level and Criminal History Score.

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Feemster*, 572 F.3d 455, 460–61 (8th Cir. 2009) (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007)). Robinson's PSR accurately calculates an offense level of 21 for the offense of Conspiracy to Commit Arson under 18 U.S.C. § 844(i) and 18 U.S.C. § 371. The PSR does so after applying a three-point reduction pursuant to USSG §3E1.1(a) (acceptance of responsibility) and USSG §3E1.1(b) (assisting authorities in the investigation or prosecution of the defendant's own misconduct). *See* PSR ¶ 32–41.

Furthermore, Robinson's PSR also accurately recommends a criminal history category of II, rather than III, which was also contemplated by Robinson's plea agreement. *Id.* ¶ 116; Plea ¶ 8. This would represent a departure from the guidelines, which would

7

ordinarily designate an offender with Robinson's criminal history as a category III. However, the PSR notes that "[p]ursuant to USG §4A1.3, a downward departure may be warranted if defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history…." PSR ¶ 116. Three of Robinson's four criminal history points emanate from a single drug possession case in Crow Wing County, Minnesota. His fourth point comes from a petty misdemeanor citation for possession of a small amount of marijuana and associated paraphernalia. *Id.* A score of four places Robinson at the very bottom of criminal history category III. Assigning Robinson to a criminal history category of II, as recommended by the PSR and contemplated by Robinson's plea agreement, would more accurately reflect his criminal history.

An offense severity level of 21 and a departure to assign Robinson a criminal history category of II gives the Court a recommended range of 41–51 months. As a class D felony, Robinson's offense would ordinarily not qualify for probation. *See* USSG §5B1.1 comment 2 ("where the applicable guideline range is in Zone C or D of the Sentencing Table…the guidelines do not authorize a sentence of probation.").

Nevertheless, the guidelines calculation is only the beginning of the Court's analysis. *See Gall*, 552 U.S. at 59 (noting that "the Guidelines are not mandatory…."). In Robinson's case, the Court should use its discretion and make a dispositional departure. The Court should require Robinson to serve 60 months on probation. Of course, the guidelines are discretionary and no "extraordinary" factor need be present to justify a downward variance. *See Gall*, 552 U.S. at 47 ("We reject, however, an appellate rule that requires 'extraordinary' circumstances to justify a sentence outside the Guidelines range.

8

We also reject the use of a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence."). However, the Court should consider numerous extraordinary factors present in Robinson's conduct and character, all of which serve to mitigate the seriousness of his offense. Robinson's offense was not a typical case of conspiracy to commit arson, and the Court should not treat it like one.

### B. The Court Should Base Robinson's Sentencing on the Facts Stipulated to in the Plea Agreement.

Given the general chaos and confusion surrounding the burning of the Third Precinct, the vast number of people involved, the general attitude of unrest that permeated the city of Minneapolis on the night of May 28, 2020 and the collaborative nature of Robinson's offense, the Court should limit its determination of the severity and character of Robinson's offense to the facts of the plea agreement between Robinson and the Government. These facts represent a carefully negotiated agreement on the events of May 28 by experienced attorneys who thoroughly reviewed all the evidence in discovery. The Court, of course, has discretion to consider facts outside the plea agreement, even conduct that was not charged at all. *See United States v. Levi*, 229 F.3d 677, 679 (8th Cir. 2000). However, in highly chaotic and confusing circumstances, such as the night of May 28, 2020, the Court is guided by *United States v. Webster*, 788 F.3d 891, 892 (8th Cir. 2015) which cautions that "A PSR is not evidence and not a legally sufficient basis for findings on contested issues of material fact."

9

Robinson's plea contains facts sufficient to convict him of an offense that Robinson himself acknowledges was "wrong" and "criminal." This plea stipulates that Robinson entered the grounds of the Third Precinct and assisted another protestor in lighting an object on fire, which that protestor then threw at the Third Precinct. *See* Plea ¶ 2. The factual basis for Robinson's plea also stipulates that the Third Precinct was abandoned, and that multiple fires had already been set, when Robinson committed his offense. *Id.* The Government's Position on Sentencing now states that Robinson deserves some culpability because "Robinson was among the first individuals to approach the Third Precinct building when the protests began to turn violent." Government Sentencing Position (ECF No. 158), pg. 11. That is contrary to the factual basis of Robinson's plea agreement, which states quite clearly that at the time of Robinson's offense "the Third Precinct headquarters were already significantly damaged by multiple fires that had been previously lit." Plea ¶ 2.

Likewise, Robinson's original indictment only accuses him of the act of assisting an unidentified co-conspirator. *See* Indictment, (ECF No. 16) (Hereinafter "Indictment"). Much of the surrounding conduct discussed in paragraph 20 of the PSR was not stipulated to by Robinson or the Government. This was the basis of an objection by the Defense on February 11, 2021, and by the Government on February 16, 2021. In that objection, the AUSA specifically noted that the factual basis of Robinson's plea said only that "defendant, assisted by an unidentified co-conspirator, lit an item being held by the unidentified co-conspirator." This is the basis for Robinson's plea, and it is this action, a small vignette in a much larger story, which the Court should base his sentence on.

Robinson reiterates his objection of February 11, 2021 to the original draft of the PSR. As stated in that objection, Robinson did not touch a Molotov cocktail, did not direct the creation of Molotov cocktails, did not light a Molotov cocktail, and did not participate in the throwing of a Molotov cocktail. While the PSR has now omitted the offending reference to Molotov cocktails, and the Government agreed that Molotov cocktails should be omitted from the PSR, the PSR at paragraph 20 discusses a great deal of peripheral conduct relating to Robinson's activities on the night of May 28, both online and on the grounds of the Third Precinct. These facts are contested, and they are not the basis of Robinson's plea, nor were they even mentioned in his indictment. *See* Plea ¶ 2; *see also* Indictment. They should not be used to obliquely imply that the object thrown by Robinson's co-conspirator was a Molotov cocktail. Robinson's acceptance of responsibility states that the object thrown was a burning roll of toilet paper, and the Defense has seen no evidence in discovery rebutting that.

Likewise, the PSR alludes to another incident where "Robinson can be seen in the building and attempting to light a fire near a stairwell on the first floor." PSR ¶ 20. A video from the incident does show Robinson in an effort to light a pile of cardboard boxes, which was unsuccessful until another unidentified protestor poured an accelerant on it.

Robinson's acceptance of responsibility statement also discusses an incident where Robinson "threw a small piece of burning wood back at the police station." PSR ¶ 27. There is video of this incident as well.

Robinson understands that the Court may consider both these incidents. Nevertheless, the Court should base Robinson's sentence primarily on the conduct for

11

which Robinson was charged and plead guilty to: lighting an object in the hand of a fellow-protestor, which that protestor threw toward the Third Precinct.

### C. The Court Should Consider Robinson's Minor Role in a Historic Offense.

The stipulated facts in Robinson's plea agreement adequately characterize both the seriousness of Robinson's actions, and the relatively minor role he played in the destruction of the Third Precinct. A thousand others participated in this offense, and Robinson's role in the offense was decidedly minor: The Third Precinct was already abandoned and damaged when Robinson provided his lighter to another protestor, who hurled burning paper at an already-burning building, without serious effect.

Robinson's actions were misguided, but ultimately inspired by profound feelings of injustice and fear. Robinson perceived himself as part of a community responding to police violence: both the violent death by fellow community-member George Floyd on May 24, and violent attacks on him and his friends in the days of protest that followed. Robinson now fully accepts that his actions were harmful, counterproductive, and criminal, but it would be unfair to consider them outside the context of the historic protests that unfolded in late May of 2020. Robinson acted as one tiny part of a community-wide outburst. The Court should be sensitive to the fact that "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Gall*, 552 U.S. at 54 (quoting the opinion of the trial court in that case).

### D. The Court Should Consider Robinson's Age and Impressionability.

The United States Sentencing guidelines state that "[a]ge (including youth) may be relevant in determining whether a departure is warranted, if considerations based on age, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines." USSG § 5H1.1.

At the time of the offense, Robinson was twenty-three years of age. Robinson was also decidedly immature for his already-young age, lacking a formal education, a traditional family, and an ordinary upbringing. He not only lacked a high school education, he had no traditional education at all beyond the sixth grade. Robinson's poor impulse control and difficulty with authority figures are understandable given his unconventional upbringing. Robinson's actions on the night of May 28, 2020 are best understood as the impetuous overreaction of a socially unmoored and isolated young man who, for the first time in his life, had found a cause he believed was worth fighting for. The way he chose to protest was, of course, misguided, but the Court should consider Robinson's errantry in the context of his overall youth and immaturity. *See Webster*, 788 F.3d at 893 (listing Defendant's age of twenty-one along with his limited education and relatively clean criminal record as factors that might have led to a shorter sentence for the defendant).

In other contexts, courts clearly recognize that "[a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions." *Johnson v. Texas*, 509 U.S. 350, 367 (1993). The Court should consider this lack of maturity in order to properly contextualize Robinson's

13

actions on the night of May 28, 2020. "[Y]outh is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage." *Eddings v. Oklahoma*, 455 U.S. 104, 115, 102 S. Ct. 869, 877, 71 L. Ed. 2d 1 (1982). The Court should apply the spirit of these cases to Robinson's case.

### E.  The Court Should Consider Previous Restraints on Robinson's Liberty.

As of March 26, 2021, Robinson has experienced 39 days of confinement in jail and more than eight months of adherence to onerous release conditions. The conditions of Robinson's release require him to reside at a halfway house or community correction center, to abstain from alcohol, and to remain at his residence at all times with very few exceptions. This is not to say that Robinson is entitled to receive "credit" for the time that he has spent in this confinement. Time spent at a community treatment center as a condition of release is not "confinement" for the purposes of 18 U.S.C. § 3585(b), the federal prison credit statute. *See Reno v. Koray*, 515 U.S. 50, 65 (1995). Rather, the Court should consider the eight months Robinson has already spent with significant restraints on his liberty in crafting Robinson's sentence. Restraints on liberty, whether or not imposed by jail confinement, are substantial impediments, and often punishments in their own right worthy of consideration. Courts recognize that even conditional or probationary status involves harsh restrictions on liberty *See Gall,* 552 U.S. at 48 ("We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty."); *United States v. Knights*, 534 U.S. 112, 119 (2001) ("Inherent in the very nature of probation is that probationers do not enjoy the absolute

14

liberty to which every citizen is entitled.") (Internal quotations removed). Robinson's restrictions were much more severe than a typical probationer's: per the terms of his release, Robinson was, and still is, required to spend the majority of his time housed and supervised within a community detention facility. The only exceptions to this supervision are "employment; education; religious services; medical . . . treatment; attorney visits; court appearances; [and] court-ordered obligations . . . ." *See* Order Setting Conditions of Release, (ECF No. 12) pg. 5. Robinson's release order also requires him to abstain from alcohol and to submit random urine samples to monitor him for drug and alcohol abstinence. *Id.*

### F. 18 U.S.C. § 3553(a) Directs the Court to Impose "A Sentence Sufficient, but not Greater than Necessary."

In making a sentencing determination, 18 U.S.C. § 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)." Those purposes include:

> [T]he need for the sentence imposed— (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

These factors all suggest that time served on probation, rather than in federal confinement, is sufficient, but no greater than necessary. *See generally United States v. Bueno*, 549 F.3d 1176, 1182 (8th Cir. 2008) (sentence of five years on probation for possession with intent to distribute seventy-one kilograms of powder cocaine was "not

15

unreasonable, nor [did] it result in unwarranted disparity" given Defendant's unique circumstances).

As regards (D), correctional treatment, Robinson is clearly in need of treatment and education. Robinson is seeking treatment for alcohol abuse through NuWay. Since January, Robinson has resided in a NuWay sober house and has diligently attended programming every week since the new year. PSR ¶ 83. He has abstained from drugs and alcohol. Robinson has signed up for online classes in order to successfully acquire his GED. *Id.* ¶ 86. A lengthy period of incarceration would hinder, not advance, the considerable progress that Robinson has made toward educational and psychological goals. It would also interfere with Robinson's admirable goal of supporting himself once his case is resolved. *Id.* ¶ 68.

As regards (C), protecting the public from further crimes of the Defendant, Robinson's criminal history contains no indication that he presents a risk to the public. The events of May 28, 2020 were historic and unprecedented, and Robinson's actions that evening were completely out of character for him. Robinson's criminal record contains only juvenile charges, and four offenses relating to motor vehicles and possession of marijuana and LSD. Robinson has no prior violent offenses.

As regards (B), affording adequate deterrence to criminal conduct, Robinson's offense on the evening of the May 28, 2020 was part of the spontaneous reaction of a group of perhaps a thousand people. At the time Robinson committed his offense on the grounds of the Third Precinct, the building was already abandoned and multiple fires had already been set on its interior and exterior. Given the unique circumstances of the incident, a harsh sentence would provide no deterrence to those who would think to engage in similar

criminal conduct. In fact, it would likely have the opposite effect, making punishment for Robinson an outlier: a prison sentence for Robinson would stand in stark contrast to hundreds of other similarly-situated participants.

None of this is to minimize the gravity of Robinson's actions on the night of May 28, 2020. Robinson fully acknowledges that his actions were criminal, and "help[d] rather than hurt" a cause he truly believed in. Factor (A), a sentence commensurate with the seriousness of the offense, justifies a sentence of 60 months on probation.

Dated: March 26, 2021                                 Respectfully submitted,

                                            By:   */s/ William J. Mauzy*
                                                  William J. Mauzy (#68974)
                                                  Mauzy Law Office PA
                                                  800 Hennepin Avenue
                                                  Suite 800
                                                  Minneapolis, MN 55403
                                                  (612) 340-9108
                                                  *Attorney for Defendant*